# EXHIBIT A

STATE OF NORTH CAROLINA
COUNTY OF CHEROKEE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

JUDITH STINES and WILLIAM HUFFMAN, individually and on behalf of a class of other similarly situated individuals,

*Plaintiffs*,

v.

PRIMEBLOCK OPERATIONS, LLC; PRIMEBLOCK MINING LLC; EXPONENTIAL DIGITAL LLC; EXPONENTIAL DIGITAL MURPHY, LLC; and INNOTECH Z, INC.,

*Defendants*.

**Case No.** 26CV000406-190

**CLASS ACTION COMPLAINT**
**JURY TRIAL DEMANDED**

Plaintiffs JUDITH STINES and WILLIAM HUFFMAN, on behalf of themselves and other similarly situated individuals, sue PRIMEBLOCK OPERATIONS, LLC; PRIMEBLOCK MINING LLC; EXPONENTIAL DIGITAL LLC; EXPONENTIAL DIGITAL MURPHY, LLC; and INNOTECH Z, INC., and allege as follows based on personal knowledge as to themselves and on information and belief as to all other matters, and demand trial by jury:

## INTRODUCTION

1. This class action arises from Defendants' willful and wanton incursion on Plaintiffs' and Class Members' quiet enjoyment of their property, in the form of

negligent emanation of excessive, unreasonable, and unremitting noise from their cryptocurrency mining facility at 3125 Harshaw Road in Murphy, North Carolina.

## PARTIES

2. Plaintiff Judith Stines is a citizen and resident of Murphy, Cherokee County, North Carolina. At all times relevant to this action, Ms. Stines has owned property located at 307 Clear Creek Road in Murphy.

3. Plaintiff William Huffman is a citizen and resident of Murphy, Cherokee County, North Carolina. At all times relevant to this action, Mr. Huffman has owned property located at 193 Ray-Mar Acres Drive in Murphy.

4. Defendant PrimeBlock Operations, LLC, is a Delaware limited liability company with a principal place of business at 589 Howard Street, Suite 100, San Francisco, California, 94105.

5. Defendant PrimeBlock Mining LLC is a Delaware limited liability company with a principal place of business at 589 Howard Street, Suite 100, San Francisco, California 94105. On information and belief, PrimeBlock Operations, LLC, is the sole member of PrimeBlock Mining LLC.

6. Defendant Exponential Digital LLC is a Delaware limited liability company with a principal place of business at 589 Howard Street, Suite 100, San Francisco, California 94105. On information and belief, PrimeBlock Operations, LLC, is the sole member of Exponential Digital LLC.

7. On information and belief, Exponential Digital LLC has changed its name multiple times. At various times, it has been known as Ankr Mining Solutions, Inc., and Exponential Digital, Inc., both Delaware corporations.

8. On information and belief, Exponential Digital LLC remains liable for obligations incurred by Ankr Mining Solutions, Inc., and Exponential Digital, Inc.

9. Exponential Digital Murphy, LLC, is a Delaware limited liability company with a principal place of business at 355 1st Street, Unit S2201, San Francisco, California 94105, registered to do business in North Carolina.

10. Exponential Digital Murphy, LLC, was previously known as Ankr Mining Solutions, Murphy, LLC.

11. On information and belief, the sole member of Exponential Digital Murphy LLC is PrimeBlock Operations LLC.

12. Exponential Digital Murphy, LLC, was previously known as Ankr Mining Solutions NC, LLC.

13. On information and belief, Exponential Digital Murphy, LLC, remains liable for obligations incurred by Ankr Mining Solutions Murphy, LLC.

14. Exponential Digital NC, LLC, was a Delaware limited liability company that was acquired by or otherwise transferred all of its assets and liabilities to PrimeBlock Operations LLC.

15. Together, the PrimeBlock, Exponential Digital, and ANKR defendants are the “PrimeBlock Defendants.”

16. Defendant Innotech Z, Inc., is a Delaware corporation with a principal place of business at 1046 S. Serrano Avenue, Unit 302, Los Angeles, California 90006. Innotech Z, Inc., was created on or about August 2024.

17. On or about June 15, 2021, Ankr Mining Solutions, Inc., acquired a plot of land in Murphy, Cherokee County, North Carolina, that included the site located at 3125 Harshaw Road.

18. Innotech Z was granted title to that same property by Exponential Digital, LLC, on or about June 24, 2025.

19. The PrimeBlock Defendants have operated a cryptocurrency mining facility and/or AI data center (the Facility) at 3125 Harshaw Rd, since on or about September 2021.

20. On information and belief, at least since June 2025, Innotech Z has participated, collaborated, or conspired with the PrimeBlock Defendants in the construction, operation, and maintenance of the Facility.

## **JURISDICTION AND VENUE**

21. The Court has jurisdiction over the subject matter of this action because the events giving rise to Plaintiffs' claims occurred in Cherokee County, North Carolina.

22. The Court has personal jurisdiction over Defendants under N.C.G.S. § 1-75.4 because Plaintiffs are persons within the State and Plaintiffs' claims arise from Defendants' acts or omissions that occurred within the state of North Carolina.

23. Venue is appropriate in Cherokee County under N.C.G.S. § 1-82 because

Plaintiffs reside in Cherokee County and the real property affected by Defendants' conduct is located in Cherokee County.

## FACTUAL ALLEGATIONS

24. This lawsuit arises from Defendants' negligent construction, operation, and maintenance of the cryptocurrency mining or AI data center facility located at 3125 Harshaw Road in Murphy, North Carolina (the Facility).

25. The Facility has caused significant disruption for its neighbors, who are largely residential property owners, interfering with their right to quiet enjoyment of their property and diminishing the value of their property by emitting unreasonable and excessive noise.

26. This disruption is a result of Defendants' negligent construction, operation, and maintenance of the Facility.

27. Solutions to abate, minimize, or even eliminate noise emanations from data centers are widely known and available.

***Cryptocurrency Mining and Data Centers***

28. Data centers and cryptocurrency mining operations, like the Facility, house computer servers and networking equipment that store and transmit digital data.

29. Cryptocurrency mining operations produce nothing. They house thousands of specialized computers running around the clock to mint speculative digital currency—an enterprise that creates no product, employs almost no one, and serves no local need. The business model is arbitrage: consume the region's electricity

and natural resources to generate private profit for its operators, who live far away, while exporting the costs onto its neighbors, in the form of the incessant roar of industrial cooling fans and hum of servers, strained utility and water infrastructure, and diminished property values.

30. The Facility's cryptocurrency mining operations are powered in significant part by electricity generated from coal at a rate approximately 41% higher than the national average. Based on the Facility's design and similarities to other PrimeBlock facilities in the region, the Facility is estimated to generate approximately 24,711 short tons of carbon dioxide per year, or approximately 74.6 tons of carbon dioxide per bitcoin mined.[1]

31. Data centers can also be used to perform AI processing operations. As with cryptocurrency mining operations, AI processing data centers provide virtually no jobs and consume vast amounts of local resources to generate profits the owners of the centers—who often live far from the data centers—while imposing the same costs on neighbors in terms of noise, strained utilities, and diminished property values.

32. The data center industry has ballooned over the past decade, driven by the explosion of AI and AI-driven applications as well as the wider acceptance of

---

[1] *Driven From Their Home, Determined to Fight*, Environmental Working Group, https://www.ewg.org/research/proof-problems-bitcoin-minings-pollution-toll-us-communities/north-carolina (last visited July 6, 2026)

cryptocurrency, resulting in a "global construction frenzy."[2] In fact, analysts predict that expansion will continue at an even faster rate over the next five years.[3]

33. The United States hosts more than 4,000 facilities as of the end of 2025, up from about 2,600 in 2021.[4]

34. These data centers and mining facilities serve AI and cryptocurrency computing needs by linking together hundreds or even thousands of servers with specialized advanced processors.

35. These configurations allow processors to work in a coordinated way to perform computing tasks more quickly and efficiently.

36. Data centers and cryptocurrency miners typically run around the clock, 365 days a year, to provide the continuous, intensive computing required for AI applications and cryptocurrency mining.

37. In the process, they consume vast amounts of energy, to run the servers and to provide the cooling they require. One analysis found that data centers in the United States consumed 183 terawatt-hours of electricity in 2024—4% of the

---

[2] April Roach, *Data Center Deals Hit Record $61 Billion in 2024 Amid Construction Frenzy*, CNBC (Dec. 19, 2025), https://www.cnbc.com/2025/12/19/data-center-deals-hit-record-amid-ai-funding-concerns-grip-investors.html.

[3] Cyrus Farivar, *Investment in Data Centers Worldwide Hit Record $61bn in 2025, Report Finds*, The Guardian (Dec. 19, 2025), https://www.theguardian.com/technology/2025/dec/19/data-centers-ai-investment.

[4] *Id.*

country's total energy consumption.[5] That number is expected to more than double by 2030.[6]

38. Only about 60% of that energy is consumed by the servers that are the facilities' reason for existing. Much of the rest—as much as 30% at less efficient facilities—is consumed largely by the cooling systems needed to prevent the servers from overheating.[7]

39. Data center and cryptocurrency energy demands are straining the energy grid and driving rate hikes for other consumers.

40. The intensive demand of a data center can require utilities to upgrade power grids and create additional capacity. Absent ratepayer protections, the cost of these upgrades falls to a large degree on smaller-scale users, including households.

41. One study estimates that data centers and cryptocurrency mining could fuel an 8% increase in the average electricity bill across the United States by 2030, with higher-demand markets seeing increases of 25% or more.[8]

42. Some markets are already seeing increases; in the PJM electricity market, which includes North Carolina, rates are up by an average of $16–$18/month in some locations.[9]

---

[5] Rebecca Lepert, *What We Know About Energy Use at U.S. Data Centers Amid the AI Boom*, Pew Research Center (Oct. 24, 2025), https://www.pewresearch.org/short-reads/2025/10/24/what-we-know-about-energy-use-at-us-data-centers-amid-the-ai-boom/#how-much-energy-do-data-centers-use

[6] *Id.* Another analysis projects that data centers in the United States will require between 395 and 660 terawatt-hours of power by 2035—roughly 10% of current consumption at the low end. Rystad Energy, *Data Centers Reshape US Power Sector*, Rystad Energy (Feb. 25, 2025), https://www.rystadenergy.com/insights/data-centers-reshape-us-power-sector.

[7] *Id.*

[8] *Id.*

[9] *Id.*

43. The enormous energy consumption comes with a major byproduct: noise.

44. That noise is created by the servers themselves, which can create noise levels as high as 96dB, but also by the generators used to provide backup power and the cooling systems that protect the servers.[10]

45. Beyond the mechanical noises, water and air circulating through cooling systems and vibration of equipment can add to the noise load.

46. Taken as a whole, a typical data center may generate noise ranging from 75 to 85 dB, with peaks up to 90 dB.[11]

47. For reference, average home noise registers about 50 dB. A gas-powered lawn mower averages about 94 dB. Sounds above 85 dB may be harmful to human hearing with sufficient duration of exposure.[12]

48. But noise has effects far beyond hearing. Over time, continual noise like that emanating from data centers can cause headaches, sleep disturbances, learning difficulties, hypertension, and heart disease; the constant presence of the noise can register for some as ringing in the ears.[13]

---

[10] Christopher Tozzi, *Why Data Centers Are Loud, and How to Quiet Them Down*, Data Center Knowledge (June 2, 2023), https://www.datacenterknowledge.com/sustainability/why-data-centers-are-loud-and-how-to-quiet-them-down.

[11] Isaac Hernandez, *Why Data Centers Are So Noisy and How to Make Them Quieter*, Acoustical Solutions, https://acousticalsolutions.com/data-center-noise-pollution (last visited July 1, 2026).

[12] Natan Bauman, *Decibel Levels: How Loud Is Too Loud?*, Safe Sound Guide, https://www.safesound.guide/decibel-guide (last visited July 1, 2026).

[13] Jennifer Biddle, *How Noise Pollution Quietly Affects Your Health*, Center for Occupational and Environmental Health, UC Davis (June 2, 2025), https://coeh.ucdavis.edu/research/how-noise-pollution-quietly-affects-your-health; Miguel Yañez-Barnuevo, *Communities Are Raising Noise Pollution Concerns About Data Centers*, Environmental and Energy Study Institute (Mar. 23, 2026), https://www.eesi.org/articles/view/communities-are-raising-noise-pollution-concernsabout-data-centers.

49. The effects are highly associated with long-term noise exposure, and they may be particularly serious in children.[14] One study observed a positive association between nighttime noise and stroke.[15]

50. Many solutions exist to control or abate the noise emanating from a data center, from basic solutions like sound-baffling barriers, soundproofing blankets on outdoor mechanical units, and pads under machines to prevent vibration, to sophisticated airflow modeling to minimize noises associated with fans and airflow.[16]

51. The prototypical data center is a giant campus running thousands of servers, operated by a "hyperscaler" like Amazon, Apple, or Google.[17]

52. These facilities frequently sit on hundreds or thousands of acres of land, providing a buffer between the facility and the surrounding community, and they are constructed to manage sound emanations.

53. But smaller operators of both data centers and cryptocurrency mining operations abound, and they are increasingly drawn to more remote locations, where land and energy prices are cheaper, zoning requirements may be lighter, and the energy infrastructure is relatively easy to access.

54. These smaller facilities may slip into communities, construct a facility quickly, and begin operation before neighbors even realize they have arrived.

---

[14] *Id.*

[15] *Id.*

[16] *See* Tozzi, *supra*; Hernandez, *supra*.

[17] *See* Melissa Palmer, *Hyperscalers: The Complete Guide to What, Why and How*, Solarwinds (Jan. 24, 2023), https://www.solarwinds.com/blog/hyperscalers-the-complete-guide

55. Their business model relies on minimizing time and cost in construction, which often means minimal attention to noise abatement. They may rely on gas-powered generators for supplemental or backup power, adding to the noise load both through the noise they generate directly and through additional noise associated with heat dissipation and other systems needed to manage the heat and exhaust they produce.

56. These data centers or cryptocurrency miners generate a wide array of noises, from continuous engine roar, to the low hum of working HVAC systems, to the mechanical vibration and high-pitched squealing produced by fans.

57. They also produce low-frequency noise that is felt in the body as a physical vibration and that may be transmitted through the ground. These low-frequency noises may be perceptible even indoors when exterior sound levels are moderate.

58. The inescapable, continual noise and vibrations have a disastrous effect on the quality of life for those around the data center, resulting in annoyance, anxiety and emotional distress, disruption of sleep and its associated consequences, physical symptoms, and diminution of property value.

59. All of these consequences are well known, as is the availability of solutions to abate and manage noise. Defendants knew or should have known that constructing their cryptocurrency mining operation or AI data center in proximity to residential areas would generate substantial noise and other effects that would interfere with residents' ability to enjoy their property.

60. The effects Plaintiffs have experienced, including continual, intrusive noise, were, therefore, entirely foreseeable to Defendants and entirely preventable by them.

***Murphy, North Carolina, and the Facility***

61. Murphy, North Carolina, is a small mountain town located at the confluence of the Hiwassee and Valley Rivers.

62. The town was founded in the mid-1800s, helped along by its role as the terminus of two railroad lines.

63. Because of its location in the heart of the Blue Ridge mountains, the town has retained its rural, small-town character. The town has approximately 1,852 residents; another 31,245 people live in surrounding Cherokee County.

64. While many of those people were born in western North Carolina, many come to the area for its remote mountain life, the state and national parklands in the area, its abundant wildlife, and above all, its quiet.

65. For many residents, that quiet has been shattered by the advent of the Facility, which opened as a cryptocurrency mining operation in mid-2021.

66. At its inception, the three-acre site hosted five shipping containers filled with servers and cooled by fans.[18]

67. Residents quickly raised the alarm about unremitting noise from the Facility. At an October 18, 2021, meeting of the county commissioners, resident

---

[18] Penny Ray, *Residents Decry Crypto Mining Farm*, Cherokee Scout (Nov. 2, 2021), https://www.cherokeescout.com/local-newsletter/residents-decry-crypto-mining-farm.

Jennifer Lugiewicz told commissioners that the noise in her front yard rose to about 65 decibels—a level of noise between a normal conversation and a residential vacuum cleaner.[19]

68. Others described the noise as "intolerable."[20] County Commissioner Jan Griggs compared it to a commercial jet at take-off.[21]

69. The Board of Commissioners responded to residents' concerns by contacting the Facility's owners and asking county staff to investigate the issue.

70. Commissioners attempted to amend the county's noise ordinance in April 2022, to limit ambient sound to a sustained level below 50 dB, but the effort failed.[22]

71. The county passed a moratorium on new crypto mining facilities in October 2023,[23] and asked the state government for more power to regulate crypto facilities.[24]

72. But neither action applies to existing facilities, and neither applies to AI data centers.[25]

---

[19] *Id.* In an interview with a local Fox News affiliate, Michael Lugiewicz called the noise "insane" and described it as "sound[ing] and feel[ing] like you're sitting behind a jet on the tarmac and that jet never leaves." Fox News, *North Carolina Crypto Mine Driving Residents Out of Rural Town Amid Noise, Blackout Concerns* (Jan. 23, 2023), https://www.foxnews.com/video/6319121401112.

[20] *Id.*

[21] *Id.*

[22] Jared Putnam, *New Noise Ordinance Passed But Can't Stand*, Cherokee Scout (Apr. 19, 2022).

[23] Randy Foster, *Town Bans Crypto Mines Inside Its Borders*, Cherokee Scout (Aug. 20, 2024), https://www.cherokeescout.com/local-newsletter/town-bans-crypto-mines-inside-its-borders.

[24] Charles Duncan, *Another N.C. County Moves to Stop New Bitcoin Mines. Here's Why*, Spectrum News 1 (May 9, 2023), https://spectrumlocalnews.com/nc/charlotte/news/2023/05/09/another-n-c--county-moves-to-stop-new-bitcoin-mines--here-s-why.

[25] Foster, *Town Bans Crypto Mines*, *supra*.

73. Meanwhile, residents continue to deal with unabating noise that interferes with their enjoyment of their property, affects their health, and undermines the value of their property.

74. Residents have also noted an increased frequency in rolling blackouts that they attribute to the Facility's load on the power grid.

75. Residents reported that during rolling blackouts caused by winter storms and increased grid demand, the Facility continued to draw power and operate while surrounding homes lost electricity. Residents observed that even when their own lights were off, the cryptocurrency mine still had access to power.[26]

***Plaintiffs' Experience***

76. Plaintiff Judith Stines lives just over 5,000 feet from the Facility (driving distance is 1.5 miles). She bought her home in 2016, planning to retire there.

77. She first noticed the noise from the Facility in September 2021. She describes the sound as "just awful. Absolutely awful. . . . it was like that 24/7/365." At that time, the sound was "like a jet engine."

78. The mine ran constantly, she said, even when the surrounding neighborhoods did not have power due to the load.

79. Since that time, she has lived inside, with her windows closed and locked and blinds down to cut the noise. Murphy, she says, "hasn't turned out to be the wondrous place I thought it would be."

---

[26] Bailee Hill, *North Carolina Crypto Mine Drives Residents Away Over 'Insane' Noise, Electric Grid Concerns*, Fox News (Jan. 23, 2023), https://www.foxnews.com/media/north-carolina-crypto-mine-drives-residents-away-insane-noise-electric-grid-concerns.

80. She has given up working or sitting outside; her patio furniture has not been used since 2021. She no longer gardens.

81. The louder roaring noise has abated over time, but Ms. Stines continues to live with a constant rumbling noise along with some high-pitched squealing. The noise is "unrelenting," in Ms. Stine's words.

82. She has also experienced vibration inside her home, including in the windows.

83. Ms. Stines has had trouble sleeping because of the noise. In 2021 and 2022, she experienced chronic headaches and anxiety. In June 2026, she was admitted to the hospital with heart problems and hypertension.

84. Ms. Stines considered selling her home but fears the noise will make the house too difficult to sell. She also is concerned that the value of the property has fallen since the crypto mine went in.

85. She has noticed that new equipment recently arrived at the Facility, perhaps as much as five shipping crates of equipment. She dreads what the sound will be like when that additional equipment is installed and powered up.

86. Plaintiff William Huffman lives 1.48 miles from the Facility (2.3 miles driving distance).

87. Mr. Huffman bought his property several years ago, with the intent to retire there. "I always had it that, you know, when I retire, I want to go to the mountains," he says. "I just love the peace and quiet."

88. Mr. Huffman experienced noise beginning a few months after the Facility opened, and that noise has not abated in the years since.

89. Mr. Huffman currently experiences a constant low-frequency hum, like the hum of a commercial HVAC system. The hum never stops; it is more audible at night, when other noises are absent.

90. Furthermore, Mr. Huffman can feel a vibration that goes with that hum inside his house.

91. He also sometimes hears a high-pitched squeal.

92. The key characteristic of the noise, for Mr. Huffman, is that it is "constant" and that it is "humming that's almost like a buzzing in your ear."

93. Since the Facility began operations, Mr. Huffman has been prescribed medication to help him sleep and another medication for anxiety, and he has been diagnosed with hypertension.

94. He also has witnessed additional trailers at the site and believes the owners are preparing either to expand it or to convert to an AI data center.

95. Both Ms. Stines and Mr. Huffman have been involved in efforts to address the problems caused by the Facility.

96. They have attended and spoken at Board of Commissioner meetings and participated in citizen group efforts to draw attention to the problems.

97. Mr. Huffman complained to the sheriff's office shortly after the noise began and was told there was nothing the sheriff could do.

98. None of these efforts have produced results.

99. The owners and operators of the Facility have declined to attend meetings or to provide information about efforts to mitigate or eliminate the noise.

100. Plaintiffs are not aware of any such efforts, and they have not noted any changes in the format or construction of the Facility (besides the additional trailers noted by Ms. Stines).

101. In the meantime, Plaintiffs have suffered themselves, and they have watched their neighbors suffer. Some have moved out. Others have struggled to sell their property.

102. Although Defendants continue to profit from operation of the Facility, they have declined to invest in easily available noise-abatement measures that would prevent their operations from interfering with Plaintiffs' and Class Members' use and enjoyment of their property.

103. On information and belief, Defendants are preparing to expand the Facility in a manner that will further increase its noise emissions.

104. Plaintiffs have noted the recent arrival of additional machinery and containers on the site.

## CLASS ACTION ALLEGATIONS

105. Plaintiffs bring this class action on behalf of themselves and the following class:

> All natural persons who own or have owned and live or have lived on residential property within a two-mile radius of 3125 Harshaw Road, Murphy, North Carolina, from September 2021 to the present.

106. Plaintiffs are members of the Class. Excluded from the Class are the

Judge to whom this case is assigned, any members of the Judge's immediate family, and counsel of record in this action.

107. Members of the Class are so numerous that joinder of all members would be impracticable. A search of Cherokee County tax records revealed nearly 1,000 property owners within the defined radius.

108. The Class is ascertainable because property, property owners, and transactions involving real property can be identified via public records. Owners' residence on the property may be verified via utility bills or other records accessible to Class Members and to Class Administrators.

109. Common questions of law and fact predominate over any questions affecting only the individual members of the Class. The questions of law and fact involved create a well-defined community of interest with regard to the parties to be represented. The questions of law and fact common to the Class include:

a. Whether the Facility had a duty to nearby property owners and the public at large to mitigate foreseeable excessive and unreasonable noise emanations.

b. Whether the noise emitted from the Facility was excessive and unreasonable.

c. Whether the noise emitted from the Facility created a private nuisance such that Plaintiffs and Class Members are entitled to damages.

d. Whether Plaintiffs and Class Members incurred special damages

from any public nuisance created by the Facility such that they are entitled to damages.

e. Whether Plaintiffs and Class Members experienced a loss of quiet enjoyment, loss of property damage, or other losses that entitle them to compensation.

f. Whether Defendants' actions were wanton and willful, entitling Plaintiffs and Class Members to punitive damages.

110. Plaintiffs' claims are typical of the claims of other members of the Class. Plaintiffs have no interests antagonistic to those of the Class. Defendants' defenses are and will be typical of and the same or identical for each of the members of the Class and will be based on the same legal and factual theories. Defendants have no defenses unique to Plaintiffs.

111. Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced in class and complex litigation. Plaintiffs' counsel have extensive experience in complex litigation and class actions and have adequate financial resources to ensure that the interests of the Class will not be harmed.

112. If appointed class representative, Plaintiffs are aware of and committed to faithfully uphold their duties to absent class members. Plaintiffs and their counsel are committed to the vigorous prosecution of this action and will allocate the appropriate time and resources to ensure that the class is fairly represented. Plaintiffs and their counsel will therefore fairly and adequately assert and protect

the interests of the Class.

113. A class action is superior to all other available methods for this controversy because (i) the prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; (ii) the prosecution of separate actions by the members of the Class would create a risk of inconsistent or varying adjudications with respect to the individual members of the Class, which would establish incompatible standards of conduct for Defendants; (iii) Defendants acted or refused to act on grounds generally applicable to the Class; and (iv) questions of law and fact common to members of the Class predominate over any questions affecting only individual members.

114. Plaintiffs do not anticipate any difficulty in the management of this litigation.

## CAUSES OF ACTION

### COUNT I—PRIVATE NUISANCE

115. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

116. Defendants have unreasonably used their property in a way that invades and interferes with Plaintiffs' use and enjoyment of their property and has caused substantial injury to, and loss of value of, Plaintiffs' property.

117. The intensity, duration, and character of the noise emitted by the Facility are such that a reasonable person of ordinary sensibilities residing in the community would consider it a substantial and unreasonable interference with the use and enjoyment of their property.

118. Plaintiffs own property and maintain residences on their property within the Class Area. Plaintiffs' properties have been used for residential purposes since before the advent of Defendants' usage of their property as a data center.

119. As a result of Defendants' operation of the data center, the Facility produced excessive noise that invaded and diminished the value of Plaintiffs' property.

120. The excessive noise generated by the data center substantially and unreasonably interferes with Plaintiffs' and Class Members' enjoyment of their properties and limits their ability to use their properties, by, for example:

- Interfering with Plaintiffs' and other Class Members' ability to sleep or rest, especially at night when other noises are quiet;
- Forcing Plaintiffs and Class Members to remain inside their homes and forego use of their yards, porches, and other outdoor spaces;
- Causing Plaintiffs and Class Members to keep doors and windows closed when they would otherwise have them open; and
- Otherwise depriving Plaintiffs and Class Members of the value of their homes and properties.

121. As a result of the noise generated by the data center, which permeates the atmosphere of the surrounding residential properties, Plaintiffs and Class

Members have experienced substantial reductions in property values and difficulty selling properties.

122. The noise generated by the data center was a known product of data center operations, and its invasion into surrounding residential properties was a foreseeable consequence of the data center's location in proximity to residential properties.

123. The noise emissions from Defendants' data center are abatable with ordinary care in the design, construction, operation, and maintenance of the facility.

124. Defendants failed to reasonably design, construct, operate, repair, and maintain the data center to ameliorate or minimize the noise resulting from its operations.

125. In so doing, Defendants knowingly and recklessly created a nuisance that unreasonably interferes with Plaintiffs' and Class Members' rights to enjoy their property.

126. Any social utility provided by the data center is outweighed by the harm suffered by Plaintiffs and Class Members, who have been deprived of the full use and enjoyment of their properties and endured substantial loss of the use and value of their properties.

127. The Facility provides minimal, if any, social utility to the community of Murphy or Cherokee County. Cryptocurrency mining creates no tangible product, employs virtually no local workers, and generates revenue solely for out-of-state corporate operators. Whatever minimal tax revenue the Facility generates is vastly

outweighed by the harm it imposes on Plaintiffs, Class Members, and the community.

128. Thus, Defendant's unreasonable, reckless, and knowing interference with Plaintiffs' and Class Members' use and enjoyment of their properties constitutes a private nuisance.

129. Defendants are liable to Plaintiffs and Class Members for all damages arising from such nuisance, including compensatory, injunctive, and exemplary relief, as well as punitive damages.

## COUNT II—PUBLIC NUISANCE

130. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

131. The unreasonable and excessive noise emitted by Defendants' data center has been and continues to be emitted across public and private land throughout the Class Area.

132. The Class Area includes business, churches, schools, and public facilities, including national, state, and local parklands.

133. Members of the public are subjected to the excessive noise emanating from Defendants' data center to an unreasonable degree, interfering with their ability to enjoy the public facilities and public land within the Class Area.

134. The noise affects the public when they work, study, worship, engage in recreation, or participate in other activities within the Class Area.

135. Thus, the unreasonable and excessive noise emanating from Defendants' data center constitutes a public nuisance.

136. Plaintiffs and Class Members use their properties within the Class Area as residences. As a result, they have experienced special and particular damages different in kind, and not merely in degree, from those suffered by the general public.

137. Specifically, Plaintiffs and Class Members have been deprived of the full use and enjoyment of their properties and endured substantial loss in the value of those properties.

138. These are not harms experienced by members of the public who are subjected to the excessive and unreasonable noise from Defendants' data center.

139. Consequently, Defendants are liable to Plaintiffs and Class Members for all damages arising from such nuisance, including compensatory, injunctive, and exemplary relief, as well as punitive damages.

**COUNT III—NEGLIGENCE**

140. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

141. Defendants owed, and continue to owe, a duty to Plaintiffs and Class members to prevent and abate unreasonable interference with, and invasion of, their private property interests.

142. A properly constructed, operated, and maintained data center will not emit excessive noise into surrounding areas.

143. The emission of excessive noise into surrounding properties is a foreseeable consequence of an improperly constructed, operated, or maintained data center.

144. Defendants breached their duties by negligently constructing, maintaining, and operating the data center, specifically by:

- Failing to install and maintain adequate soundproofing equipment for data center operations, including cooling systems, fans, and generators;
- Failing to install and maintain adequate acoustic barriers or dampeners for data center operations, including but not limited to barriers around the perimeter of the data center site;
- Failing to install and maintain adequate noise monitoring systems;
- Failing to develop and implement an adequate noise prevention plan;
- Failing to use or implement available noise prevention and mitigation measures and technologies; and
- Other failures that may be revealed in discovery.

145. By failing to properly construct, maintain, and operate the data center, Defendants have failed to exercise their duty of ordinary care and diligence.

146. Defendants breach of their duty was the direct and proximate cause of the invasion of Plaintiffs' and Class Members' homes and of the damages to their private property interests.

147. The generation of excessive noise and its invasion into surrounding properties was a foreseeable consequence of Defendants' failure to properly construct, operate, and maintain the data center so as to limit such noise.

148. Defendants knowingly, recklessly, and with conscious disregard for the rights of Plaintiffs, Class Members, and the public failed to prevent the emanation of excessive noise from the data center and the invasion of Plaintiffs' and Class Members' properties by that noise.

149. Consequently, Defendants are liable to Plaintiffs and Class Members for damages arising from their negligence, including compensatory, injunctive, and exemplary relief, as well as punitive damages.

## COUNT IV—GROSS NEGLIGENCE AND WILLFUL OR WANTON CONDUCT

150. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

151. Defendants owed, and continue to owe, a duty to Plaintiffs and Class members to prevent and abate unreasonable interference with, and invasion of, their private property interests.

152. Defendants' failure to properly construct, operate, and maintain the data center to avoid or minimize the emanation of noise from the data center was willful and wanton, and thus grossly negligent.

153. Defendants were aware of complaints by Plaintiffs and Class Members, as well as the community at large, regarding the noise created by the data center.

154. Defendants declined to attend community meetings or to engage with public complaints.

155. Despite their awareness of these complaints, Defendants declined to engage with the community or to implement available measures to abate the noise,

leaving Plaintiffs and Class Members to continue to struggle with the excessive noise created by the data center.

156. On information and belief, the officers, directors, and managers of the corporate Defendants participated in and condoned the willful and wanton conduct alleged herein, including the decisions to construct, operate, and expand the Facility without implementing available and well-known noise-abatement measures despite actual knowledge of the harm the noise was causing to Plaintiffs, Class Members, and the surrounding community.

157. As a direct and proximate cause of Defendants' gross negligence and willful or wanton conduct, Plaintiffs and class members have suffered and will continue to suffer substantial invasion of their personal property rights, loss of enjoyment of their property, and substantial loss of value.

158. Consequently, Plaintiffs and Class Members are entitled to compensation for all damages caused by Defendants' willful and wanton conduct, including compensatory, injunctive, and exemplary relief.

159. Plaintiffs are also entitled to recover punitive damages as allowed by N.C.G.S. § 1D-1 *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and in favor of the class, and against Defendants, as follows:

a. Certify a class action pursuant to Rule 23 of the North Carolina Rules of Civil Procedure;

b. Designate the named plaintiffs as class representatives and Plaintiffs'

counsel as class counsel;

c. Find that Defendants, by their conduct allowing excessive noise to invade Plaintiffs' and Class Members' properties, have created a private nuisance and a public nuisance;

d. Find that Defendants have been negligent and grossly negligent;

e. Award Plaintiffs and Class Members compensatory and exemplary damages;

f. Award Plaintiffs and Class Members punitive damages;

g. Award attorneys' fees, litigation expenses, and costs of suit;

h. Award Plaintiffs and Class Members injunctive relief not inconsistent with Defendants' local, state, and federal regulatory obligations; and

i. Award such other and further relief as the Court deems proper under the circumstances.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted this 7th day of July 2026,

Respectfully submitted,

/s/ *W. Stacy Miller*
W. Stacy Miller, II
N.C. Bar No. 21198

MaryAnne M. Hamilton
N.C. Bar No. 59323

MILLER LAW GROUP, PLLC
PO Box 6340
Raleigh, North Carolina 27628
T: (919) 348-4361
maryanne@millerlawgroupnc.com

/s/ *Elliot S. Abrams*
Elliot S. Abrams
N.C. Bar No. 42639

CHESHIRE PARKER SCHNEIDER
& ABRAMS PLLC
133 Fayetteville Street, Suite 400
Raleigh, North Carolina 27602
T: (919) 833-3114
elliot.abrams@cheshirepark.com

/s/ *Scott C. Harris*
Scott C. Harris
N.C. Bar 35328
James R. DeMay
N.C. State Bar No. 36710
BRYSON HARRIS SUCIU & DEMAY PLLC
900 W. Morgan Street
Raleigh, North Carolina 27603
T: (919) 600-5003
sharris@brysonpllc.com
jdemay@brysonpllc.com